MEMORANDUM OF DECISION
This case presents a coterminous petition for the termination of parental rights of Iris P., biological mother and Jorge A., biological father, filed by the Commissioner of the Department of Children and Families (hereinafter referred to as DCF), of the child, Jorge Jr. A.[2]
The child was born on April 25, 1999, and an order of temporary custody was granted on May 7, 1999. On May 7, 1999, DCF filed a petition of neglect and uncared for against both parents together with a Petition for Termination of Parental Rights against the mother.
The grounds alleged in the neglect and uncared for petition were that CT Page 13613 the child was being denied proper care and attention, that the child was permitted to live under conditions injurious to his well being and that the child was homeless. The sole ground alleged in the termination of parental rights petition was that the mother of the child under the age of seven years, who is neglected or uncared for, has failed, is unable or is unwilling to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of the Department of Children and Families.
A petition for termination of parental rights was filed against the father on January 18, 2000, alleging that the child has been abandoned in the sense that the father has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. A motion to amend the initial petition for termination against the mother was granted February 15, 2000 to add the count of abandonment.
Iris P. was duly served and notified of the pendency of the petitions. She appeared and was given a court appointed attorney. As to the father, there was no service on the plea date of February 15, 2000. The plea hearing was continued to March 9, 2000 to confirm service. On that date, DCF still did not have a confirmation of service. A new plea date was scheduled for April 20, 2000, and on that date there was no service. However, the attorney for the father reported that the father was incarcerated in Florida and waived any defect in service.[3]
When neglect and termination proceedings are coterminously filed, the court is required to proceed in three separate stages. First, the court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. In re Juvenile Appeal (84-AB), 192 Conn. 254, 263,471 A.2d 1380 (1984). If the court finds the child to have been neglected or uncared for, disposition is deferred until a decision is made on the termination petition.
The second stage is the termination adjudication phase. In this a phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment to it. In re Joshua Z., 26 Conn. App. 58, 63, 597 A.2d 842
(1991), cert. denied 221 Conn. 901 (1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. If grounds have been CT Page 13614 found to adjudicate the child neglected or uncared for and to terminate parental rights, applying the respective standard of proof, the court must then consider whether the facts as of the last day of trial establish by clear and convincing evidence that termination is in the best interest of the child.
 I FACTUAL FINDINGS
At trial, DCF introduced three documentary exhibits and the testimony of Geraldo Omelda, a DCF social worker. The credible and relevant evidence offered at trial supports the findings of the following facts.
On April 27, 1999 a referral from a social worker at Connecticut Children's Medical Center was made to DCF regarding a baby born on April 25, 1999, Jorge Jr. A. He was born premature and was suffering from complications — respiratory distress, occasional episodes of apnea, and sepsis[4] — which required hospitalization. The mother, Iris P., admitted to prior substance abuse and that she has seven other children, all removed from her care. Her parental rights on five of the children were terminated. An order of temporary custody was filed together with a neglect petition and a petition for termination of parental rights on the mother on May 6, 1999 and the order of temporary custody was granted ex parte and subsequently sustained at a hearing on May 14, 1999.
At that hearing, both the mother and the father appeared and were given court appointed attorneys. Counsel for the mother raised the issue of her competency and her ability to understand the nature of the co-terminous proceedings. Although the court did not order a competency evaluation, it did order the mother to participate in any evaluations arranged by DCF. (Dyer, J.)
At a subsequent hearing, the court without objection entered as an exhibit the comprehensive psychiatric evaluation of the mother performed by Marvin Zelman, M.D. which concluded that the "mother cannot be restored to a level of competency that would allow her to fully participate in the case. Her history indicates that she has never functioned at a higher level so `restoration' is not possible."[5] The court appointed a guardian ad litem for the mother based upon those findings and who appeared at all subsequent hearings. (Dyer, J.)[6]
Iris P. has a history of being an alcohol, marijuana and cocaine user. Five of her seven children were born testing positive for cocaine. A psychological evaluation completed in 1990 indicates that she is CT Page 13615 moderately retarded with a full scale IQ of 59. She has no job history and has been involved in the criminal justice system. Although her history indicates that she has been assisted by nineteen other agencies, she has clearly not benefited from their services. She has a history of unstable housing, inadequate income and is often homeless. Since her involvement with DCF dating back to 1991, she has often times been whereabouts unknown, simply leaving her children with relative care givers or demonstrating a complete lack of parenting skills. Throughout her involvement with DCF she has been a chronic substance abuser and has never sought any treatment. During her pregnancies she has not sought prenatal care and has continued to use drugs, subjecting her unborn fetuses to her own cocaine addiction.
She has demonstrated an inability to care for her prior seven children, as her rights for five of her children have been terminated, and the guardianship of the other two children was transferred to relatives.
The mother has never contacted DCF regarding her child, Jorge, and has only seen him once since his birth at a DCF supervised visit. She has participated in no services. Both her court appointed attorney and her guardian ad litem have had no contact with her and have no knowledge as to her whereabouts, although there was testimony that she may have followed the father to Florida.
The father, Jorge A., also presents an extensive history of substance abuse, criminal involvement and incarceration, and unstable housing. He has admitted to a history of heroin use since age twelve, prior use of marijuana and cocaine, and selling illicit substances. He has reported that he is diagnosed with a virus that causes a terminal illness and it is unknown if he receives any treatment for such ailment.
Between May and August 1999, the father participated in counseling services with Latinos Contra SIDA. The extent of his participation could not be confirmed, however, because he has been out of state and DCF does not have a current release of information. This organization assisted the father in securing an apartment for himself, the mother and the infant and provided a crib, infant clothes, a car seat, a stroller and other items for the infant. Despite all this assistance, the father and the mother left the apartment due to lack of payment of rent.
Soon thereafter, the father relocated to Florida and was whereabouts unknown from September 1999 until he notified the DCF worker in February, 2000 that he was incarcerated in Florida. He contacted DCF and actually participated in an administrative case review via telephone on June 8, 2000. He was to be released in twenty seven days, he was going to CT Page 13616 try and locate a job in Florida, and then return to Connecticut to try and reunify with his son. Although he was told to contact his attorney, he never did so but did contact the child's attorney and told her the same story about his release date and his intentions.
The social worker verified that the father was released on July 10, 2000. The worker was given the phone number of the father's probation officer, however, was unable to obtain any address or phone number for the father.
The father did offer his parents as a potential placement for Jorge Jr. A. They were ambivalent about removing the child from his placement, where he has been since his discharge from the hospital at birth. In an effort to assist DCF in making a decision as to the child's best interest for placement, the assistance of a licensed psychologist, Dr. Migdalia Rivera-Arzola, was sought. Rivera-Arzola met with both families for a period of eight weeks and recommended that the child remain in the home of the foster parents. The paternal grandparents agreed with the recommendation of the doctor.
Jorge Jr. A., although born with respiratory distress and related problems related to his prematurity, is doing very well. Because his father has a life threatening illness, Jorge is tested regularly for the illness and the tests have been negative. He was placed in the pre-adoptive home directly from the hospital and the foster parents are committed to adopting him. He is very bonded to his foster parents and began saying his first words in May.
Since his placement, he has visited with his biological mother on one occasion. His biological father visited him a couple times while he was still in the hospital after his birth. He visited with him on two other occasions before he left for Florida. Neither parent has ever inquired about Jorge nor have they ever sent any cards or gifts or acknowledged any major holidays.
 II NEGLECT/UNCARED FOR ADJUDICATION
The neglect petition alleges that as provided in the relevant statute, he was "being denied proper care and attention, physically, educationally, emotionally or morally: and he was "being permitted to live under conditions, circumstances or associations injurious to his well-being." The petition also alleges that he was uncared for in that, under the relevant statutory definition, his home cannot provide the "specialized care which the physical, emotional or mental condition the CT Page 13617 child requires." Conn. Gen. Stat. § 46b-120(9). DCF has the burden of proving these allegations by a fair preponderance of the evidence. Practice Book § 33-12.
The court finds that the petitioner has established by a fair preponderance of the evidence that Jorge Jr. A. was neglected within the meaning of the statute in that, at the time of his birth, the mother and the father did not provide him with the proper conditions under which a newborn, especially one with . . . his severe medical condition requires and was uncared for in that his home cannot provide the specialized care which his physical and emotional condition requires. See In re Kelly S.,29 Conn. App. 600, 613, 616 A.2d 1161 (1992).
 III TERMINATION ADJUDICATION
Each statutory basis set out in General Statutes Sec. 17a-112(b) is an independent ground for termination. In re Baby Girl B., 224 Conn. 263,618 A.2d 1 (1992). The petitioner is required to prove one or more of the two grounds alleged in its petition by clear and convincing evidence.
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceedings that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1).
The termination petition alleges that, as of January 18, 2000[7], the mother was unable or unwilling to benefit from reunification efforts. The court finds this allegation proven by clear and convincing evidence. First, Iris' inability or unwillingness to rehabilitate is evidenced by the total lack of cooperation and effort she has exhibited in the past with respect to her reunification efforts for her other seven children. When a mother delivers her eighth child exposed to cocaine, the evidence is clear and convincing that she is unwilling or unable to benefit from reunification efforts.
As to the father, the court finds that as of January 18, 2000, he is unable or unwilling to benefit from reunification efforts. The court finds this allegation proven by clear and convincing evidence. He has refused to participate in the services offered by DCF, clearly evidenced by his leaving Connecticut without any contact to DCF until after he was incarcerated in Florida to advise them of his whereabouts. CT Page 13618
B. Abandonment — General Statutes § 17a-112(c)(A)
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child. Sporadic efforts are insufficient to negate the claim of abandonment. The test for determining abandonment of a child for purposes of termination of parental rights is not whether a parent has shown "some interest" in his or her child, but rather, whether the parent has maintained any reasonable degree of interest, concern, or responsibility as to the child's welfare. In re Rayna M., 13 Conn. App. 23, 36,534 A.2d 897 (1987).
Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M., 6 Conn. App. 194, 209,504 A.2d 533 (1986). From the child's date of placement, several weeks after his birth to the present, the respondents failed to maintain consistent visits or to have any regular, meaningful personal interaction with the child.
One would hope that a mother would inquire about a newborn. But this mother expressed absolutely no concern for the welfare of her child. The court can only assume that her drug addiction coupled with her limited mental capacity has a major influence over her actions or inaction. As for the father who could have possibly passed on his own life threatening illness to a helpless baby, he, too, did not show any concern. Regardless of whether he is too far damaged by his drug addiction rendering him incapable to care for his baby or show any interest or concern, the fact remains, for whatever reason, he did not. He sent no cards or letters, never contacted the foster parents, and when he did talk to the social worker, he expressed his own plans but did not inquire of his child's health or well being.
Statutory abandonment on the part of the mother, Iris P., and the father, Jorge A., has been proven by clear and convincing evidence. Each has failed to display the minimal attribute of parental obligation. Neither has manifested a consistent, prolonged and reasonable degree of affection, interest, concern or responsibility as to their child's welfare. In re Rayna M., 13 Conn. App. 23, 37-38, 534 A.2d 897 (1987); Inre Michael M., 29 Conn. App. 112, 121-123, 614 A.2d 832 (1992).
C. Failure to Rehabilitate and Prior Rights Terminated: Gen. Stat. §17a-112(c)(3)(E)
CT Page 13619
The second ground alleged in this case against the mother is that:
 the parent of a child under the age of seven years who is neglected or uncared for, has failed, is unable or is unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child and such parent's parental rights of another child were previously terminated pursuant to a petition filed by the Commissioner of Children and Families. Conn Gen. Stat. § 17a-112(c)(3)(E).
This ground for termination differs from another failure to rehabilitate ground, Gen. Stat. § 17a-112(c)(3)(B), because it does not require a prior adjudication that the child was neglected or uncared for. This ground is designed for the unfortunately common situation where a parent whose rights to one child have been terminated, subsequently, with respect to another child under age seven, continues to exhibit the same unacceptable habits and behavior that led to the earlier termination. It is often alleged in cases where substance abusing mothers successively give birth to infants exposed to cocaine.
No dispute exists about several of the elements of this ground. First, Jorge is under seven years old. Second, the court has now found that he was neglected and uncared for as of the May 7, 1999. Finally, it is undisputed that the mother's parental rights to five of her other children were terminated as a result of a DCF petition.
The remainder of the statute tracks the language of the traditional failure to rehabilitate statute. See Conn. Gen. Stat. §17a-112(c)(3)(B). Thus is it appropriate to borrow the case law interpreting that language. This position of the statute requires the court to analyze a parent's rehabilitation "as it related to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157,167, 554 A.2d 722 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240,714 A.2d 64 (1998) (internal citation omitted). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parent's conduct before the filing of the termination petition, but also the conduct occurring after it. CT Page 13620
Iris P. has already had her rights termination on five of her other children. When Jorge was born, the mother neglected his basic needs and DCF had to take temporary custody. She admitted to a daily crack cocaine habit. She did nothing to avail herself of any services. She exhibited no concern for her baby, virtually abandoning him at the hospital and never showing a shred of concern for his well being. Her limited mental capability may have a direct impact on her ability to parent, and since she has never allowed herself to partake in any services, the court can in no way find that she will ever rehabilitate herself to a point where she could take care of her baby boy. This leaves the court with no confidence that the mother will ever be able to attend to his needs. DCF has therefore proven by clear and convincing evidence that the mother has failed to rehabilitate herself.
 IV DISPOSITION
A. Section 17a-112(e) Criteria
The court has found by clear and convincing evidence that all of the statutory grounds alleged by the petitioner for the termination of Iris P.'s and Jorge A.'s parental rights have been proven. Before making a decision whether or not to terminate respondents' parental rights, the court must now consider and make findings on each of the seven criteria set forth in Sec. 17a-112(e). In re Romance M., 229 Conn. 345, 355,641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
1. "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent."
Based on the foregoing discussion, the court finds that DCF provided appropriate and timely services including substance abuse counseling, case management, transportation assistance, and visitation coordination. Unfortunately, the mother and the father have been whereabouts unknown during the majority of the department's involvement in this case. Although DCF made diligent efforts to locate them, their whereabouts remain unknown.
2. "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act CT Page 13621 of 1980, as amended."
The court finds by clear and convincing evidence that DCF has made reasonable efforts given the situation and circumstances to reunite the family in accordance with state and federal law.
3. "The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order."
Expectations were never entered by the court. At the time of the order of temporary custody, preliminary steps were signed and there is evidence indicating that the mother and the father signed the expectations. But they were not ordered by the court at any subsequent hearing as the parents did not appear for any hearing after the initial 10 day order of temporary custody hearing. The social studies entered as exhibits indicate that expectations were ordered, however, the court record indicates otherwise. Nevertheless, neither the mother or the father complied with any services offered by DCF.
4. "The feelings and emotional ties of the child with respect to his/her parents, any guardian of his/her person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."
Jorge Jr. A. is clearly bonded to his foster parents with whom he has resided since his discharge from the hospital. His very first word spoken was to his foster mother, that being "Ma." Since he only visited with his biological mother on one occasion and his father on perhaps three occasions, he has no bond with either of them. He has thrived in this placement and the foster parents are anxious to adopt him.
5. "The age of the child."
Jorge Jr. A. is one year and six months.
6. "The efforts the parent has made to adjust his/her circumstances, conduct, or conditions to make it in the best interest of the child to return him/her to his/her home in the foreseeable future, including, but not limited to:(A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child." CT Page 13622
Iris P. and Jorge A. have maintained no consistent show of concern or interest in their child. They have failed to inquire about their baby, to DCF or to the foster parents. Neither parent has made any prolonged or sustained efforts to reunify with their child: These parents have made little effort to adjust their circumstances to permit their child to safely return to their care.
7. "The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that the unreasonable act or conduct of DCF personnel or any other person prevented the respondent father and mother from maintaining a meaningful relationship with their child. There is no evidence that the parents' economic circumstances prevented a meaningful relationship from being maintained. Since the time of the child's removal, both were offered the assistance of counsel at state expense.
B. Best Interests of the Child
The court must now address the issue of whether the termination of parental rights is in the best interest of the child. This is part of the dispositional phase of a termination proceedings. In re Valerie D., supra, 223 Conn. 511.
Permanency, consistency and stability are crucial for this very young child. He may have some medical problems which must be monitored and treated in order for him to live. The foster parents and the child's paternal grandparents have a relationship so that Jorge Jr. A. will have some sense of his own biological family. However, Jorge's best interests will be served if he remains with this family who are ready, willing and able to adopt him. He will not have to endure the endless number of placements that some of the children in the DCF system are subjected. The court concludes that termination of parental rights is in the child's best interest.
 CONCLUSION
The court having considered all statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights, further finds upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of Iris P., the biological mother and Jorge A., the biological father. Accordingly, it is ordered that their parental rights to the child are hereby terminated. CT Page 13623
It is further ordered that the Commissioner of Department of Children and Families is hereby appointed the statutory parent for Jorge Jr. A., and that the Commissioner shall file with the court, no later than sixty (60) days following the date of judgement a written report on the progress of the adoption or other related placement matters and file such further reports as are required by state and federal law.
SWIENTON, J.